IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STANDARD STEEL, LLC, and | ) | |
| DOUGLAS WESTMORELAND, L.P., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-538 |
| | ) | |
| BUCKEYE ENERGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

CONTI, District Judge.

On April 7, 2004, plaintiff Standard Steel, LLC ("plaintiff" or "Standard Steel"),

commenced the above-captioned case seeking a declaratory judgment declaring the respective

rights of Standard Steel and defendant Buckeye Energy, Inc. ("defendant" or "Buckeye") relating

to certain agreements entered into between the parties for the sale of natural gas.  On August 17,

2004, Douglas Westmoreland, L.P. ("Douglas"), was joined as a party-plaintiff.

On January 17, 2005, the parties submitted this case to private mediation presided over by

mediator and former Chief Judge of the United States District Court for the Western District of

Pennsylvania Donald Ziegler.  On January 21, 2005, counsel for the parties advised the court

that, after submitting the case to mediation, the case had settled.  On that same day, the court

ordered the case closed, but expressly retained jurisdiction in the matter to consider any issue

arising during the period when settlement was being finalized, including but not limited to

enforcing settlement.  On February 4, 2005, new counsel entered a praecipe of attorney

appearance for defendant.  On February 11, 2005, defendant filed a motion to reopen the case.

On February 25, 2005, plaintiffs filed a motion to enforce settlement. On July 27, 2005, this court heard evidence and argument during an evidentiary hearing on plaintiffs' motion to enforce settlement.  On September 12, 2005, the parties filed proposed findings of fact and conclusions of law.

In order to decide the motions, the court must address (1) whether the parties reached an oral agreement to settle the litigation; and, if so, (2) whether the oral settlement agreement is affected by a no-oral modification clause in one of the three underlying agreements at issue in the litigation and (3) whether there is a Statute of Frauds problem with enforcing the oral settlement agreement.

Pursuant to Federal Rule of Civil Procedure 52, this court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

_____1.    On April 7, 2004, plaintiff Standard Steel filed a complaint seeking a declaratory judgment declaring the respective rights of Standard Steel and defendant Buckeye pursuant to certain agreements entered into between Standard Steel and Ter-Ex, Inc., Buckeye's predecessor in interest, for the sale of natural gas.  Complaint at ¶¶ 6-16; Complaint, Ex. A, B, C.

2.    One of the three agreements underlying the litigation (the "Farmout Agreement") dated May 20, 1980, contains the following language:

> **7.    The foregoing constitutes the entire agreement between Standard Steel and Ter-Ex [Buckeye's predecessor in interest].  No change, modification or alteration of this agreement shall be valid unless the same be made or specified in writing and signed by the parties hereto, their successors, and their assigns; provided, however, that neither this agreement nor the leasehold estate above mentioned may be assigned in whole or in part without first securing Standard Steel's written consent thereto, and further**

> **provided that any assignment hereafter executed shall specifically refer to and be made subject to the terms and conditions hereof.**

Respondent's Ex. 2 at 6, ¶7 (emphasis added).

3.    The agreements underlying the litigation are contracts for the sale of goods valued at five hundred dollars or more.  Complaint, Ex. A, B, C.

4.    On May 14, 2004, defendant Buckeye filed an Answer, Defense and Counterclaim against Standard Steel seeking a declaratory judgement declaring the respective rights of Buckeye and Standard Steel regarding the same agreements and adding a counterclaim for breach of contract against Standard Steel.  Answer at ¶¶ 6-16.

5.    On August 4, 2004, Buckeye filed a motion to compel joinder of Douglas pursuant to Fed. R. Civ. P. 19(a).  Doc. No. 10.  Standard Steel did not oppose the joinder.  Doc. No. 11. The court ordered that Douglas be made a party-plaintiff to the litigation on August 17, 2004.

6.    On December 6, 2004, the parties filed a joint motion to stay discovery pending mediation.  Doc. No. 20.  On December 9, 2004, the court entered an order staying proceedings pending the outcome of the mediation.

7.    On January 17, 2005, the parties participated in private mediation before former Chief Judge Donald Ziegler (the "mediation").  Transcript of July 27, 2005 Hearing ("Tr.") at 23-27.

8.    Judge Ziegler previously served as a Judge in the Court of Common Pleas of Allegheny County for five years and as a United States District Court Judge for the Western District of Pennsylvania for twenty-five years.  Since leaving the bench, Judge Ziegler had been engaged in private practice, doing primarily mediation and arbitration.  Tr. at 23-24.

9.     Present at the mediation were Judge Ziegler and counsel and client representatives for Standard Steel, Douglas, and Buckeye.  Tr. at 24-25. Those present representing the parties had authority to make a binding agreement on behalf of the parties that day. Tr. at 25.

10.     The primary issues being mediated concerned the past and future prices for the sale of natural gas.  The five key issues being mediated were the amount that Standard would pay Buckeye for gas it had received in the past, the amount that Douglas would pay Buckeye for gas it would receive in the future, the surcharge that Douglas would pay Buckeye for gas it would receive in the future, the amount of gas that Douglas would take from Buckeye in the future, and the standard of merchantability for the gas if one were applied.  See Tr. at 26 (testimony of Judge Ziegler) (emphasis added) as follows:

> **Q.     What do you recall as being the key issue for the mediation?**
>
> **A.     Well, broadly speaking, it broke down to two issues, the amount that standard [sic] would pay Buckeye for gas it had received in the past and the amount that Buckeye would receive for gas sales in the future.**
> **Now that second issue broke down into a number of subset issues. First we had the price that Buckeye would receive in the future from Standard for the sale of gas.  The second aspect of that was a surcharge that Buckeye was demanding in addition to the base price.  The third aspect of that was the amount of gas that Standard would take on an annual basis from one of the three wells.  And then a final issue was whether or not the gas was to be merchantable in quality because one of the wells was producing natural gas that contained water.**

Melody Pritchard, President and CEO of Buckeye, confirmed that these were the key points discussed at the mediation.  Tr. at 44, 51-52.

11.     Judge Ziegler testified that it was his understanding that the parties reached an agreement to settle the litigation at the mediation:

4

**Q.** **And, Judge Ziegler, did these parties reach an agreement to settle the litigation at the mediation that you were holding that day?**

**A.** **Yes, sir.**

**\* \* \* (*objection by Buckeye*)\* \* \***

**Q.** **Judge Ziegler, did the parties reach an agreement that day?**

**A.** **Yes, sir.**

Tr. at 26-27 (emphasis added).

12. Judge Ziegler testified to his understanding of the content of the agreement to settle

the litigation:

**Q.** **What was the agreement that was reached that day?**

**A.** **The agreement was as follows: Standard would pay Buckeye $100,000 in four payments: $25,000 on March 31st, $25,000 on June 30th, $25,000 on September 30th, and $25,000 on December 31st.**
   **Going forward, Buckeye would supply gas to Standard. It would sell it for a price on the market, and the parties would split that price fifty-fifty. Next, that Standard would pay Buckeye a surcharge of ten cents on each of the MCFs thousand cubic feet of natural gas.**
   **Next, that the one well would produce at least one hundred thousand MCF on an annual basis. And that Standard would take up to one hundred thousand MCF from that well, which I believe was the Bearer well, although I may be in error what well of the three it was. I believe it was the Bearer well.**
   **And, lastly, that this oral agreement would apply to the parties with respect to all three wells.**

**Q.** **Was there any agreement as to merchantability?**

**A.** **Yes, sir; there was. Ms. Pritchard specifically stated in Phase Three of the mediation when we were all together would Standard and Douglas please define merchantability. They did, and she said, "Very good, I understand. I agree."**

**Q.** **Judge Ziegler, when you said as to the future price that Buckeye would get one-half of what Douglas was selling it for on the market, was it**

5

**your understanding that it would truly be one-half of whatever Douglas was getting for the gas?**

**A.      Yes, sir.**

**Q.      So there was no discussion about indexes or anything like that?**

**A.      None whatsoever. And one of the main contentions going into the mediation was Standard was insisting upon the continuation of the fixed price.  Buckeye was insisting on a variable going forward. And, therefore, by pegging it to the price that Douglas was able to sell the natural gas for in the future meant that the parties arrived at an agreement with which they could live.**

**        That is, the price of natural gas in the future would vary and according with market conditions, and the parties would receive fifty percent of whatever that was.  In addition, it also meant that both parties bore the risk going forward as well as the downside going forward in terms of market price.**

Tr. at 26-29 (emphasis added).

\* \* \* \* \* \*

**Q.      Do you recall today, Judge Ziegler, on that merchantability issue what the Standard and Douglas representative said when Ms. Pritchard asked the question –**

**A.      Related to the standard, I believe that Peoples Natural Gas had been receiving it.**

**Q.      Was it your understanding that Douglas was, in fact, selling the gas into the Peoples Gas system?**

**A.      Yes, sir.**

Tr. at 31 (emphasis added).

13.    Judge Ziegler testified that during the final stage of the mediation, "Phase III" in his parlance, he confirmed that each of the parties agreed to the material terms of the settlement agreement:

6

**Q.      Judge Ziegler, in your Phase Three, when the parties get back together, did you go over these material terms of the agreement with the parties together?**

**A.      Yes, sir.**

**Q.      And how do you do that – how did you do that?**

**A.      Well, I make notes after I perform my shuttled diplomacy in Phase Two, and I have the parties back in the Walter McGough room at Reed Smith.  And I stated, "Now, the parties have agreed as follows:  Standard will pay $100,000 in four annual payments to Buckeye.  Is that correct?"**
        **And the Standard representative said, "Yes."**
        **And I turned to Ms. Pritchard and I said, "Is that correct?"**
        **And she said, "Yes."**
        **I turned to the second issue, which was the market price going forward of fifty-fifty, depending on whatever Douglas sold it for, and I said to the Douglas representatives, "Do you agree?"**
        **And they said, "Yes."**
        **And I turned to Ms. Pritchard and I said, "Do you agree?"**
        **And she said, "I do."**
        **And I turned to the third issue, which was the surcharge of ten cents. I repeated the same question Standard and Douglas.  They agreed.**
        **I turned to Ms. Pritchard, made the same statement to her.  She said, "I agree."**
        **I then turned to the fourth issue, which was a hundred thousand on the one well on an annual basis, repeated the question to Standard Douglas and said, "Do you agree?"**
        **They said, "We do."**
        **I turned to Ms. Pritchard and she said, "I agree."**
        **And the final issue was merchantable quality.  I said to Standard, "Do you agree that the oil – that the natural gas must be of merchantable quality?"**
        **"Yes, sir."**
        **And I turned to Miss Pritchard and I said, "Do you agree?"**
        **And she said, "I have one question.  Will they please define merchantable quality for me," which they did.  And she said, "Yes, I agree."**
        **And those all are the issues that were resolved.  My notes were made contemporaneously with Phase Three, and all parties manifested an assent to all terms and conditions.**

Tr. at 29-31 (emphasis added).

14.   Melody Pritchard testified that she recalled Judge Ziegler going through these five key points at the end of the deposition and that she agreed with them.  Melody Pritchard, however, testified that the agreement was only to "a general understanding of those key points." Tr. at 52-53.  She clarified that position on cross-examination:

> **A.    Our position is that we had a general understanding of the points, of the key points, but we knew there was going to be a negotiated agreement that we would work on and execute that would detail those points.**
>
> **Q.    But you would agree with me that day you didn't tell Judge Ziegler or Standard or Douglas that there was going to be further negotiation, that "We're not agreeing to these five things."**
>
> **A.    I did not say that we weren't agreeing to the general key points, but I felt like everybody there knew we were going to have this agreement because we had already discussed it.  We – and I felt like everybody there was in agreement on that.**

Tr. at 56 (emphasis added).

15.   Counsel present at the mediation for Standard Steel and Douglas, Traci Rea, concurred with Judge Ziegler's testimony that the parties reached agreement on the five key points outlined by Judge Ziegler.  Deposition Transcript of Traci Rea ('T. Rea Dep.") at 9-13.

16.   On cross-examination, counsel present at the mediation for Buckeye,  Michael Delaney and Patrick Dougherty, admitted that the parties agreed to the five key points outlined by Judge Ziegler, but maintained that there were still issues outstanding after the mediation was over:

> **Q.    Okay.  Do you recall at the end of the mediation Judge Ziegler going through with all the parties present and saying, "These are the terms, do you agree" to each party?**
>
> **A.    I remember – I remember that, correct.**

8

**Q.      And Buckeye agreed, right?**

**A.      And Buckeye agreed to the items of understanding Judge Ziegler went through.  I believe there were about five of them, which were the issues that we discussed that day.**

Tr. at 75 (testimony of Michael Delaney) (emphasis added).

**Q.      Mr. Delaney, . . . . Is it your testimony that the parties reached an oral agreement at the mediation and agreed at the mediation that they would formalize that agreement in a written document?**

**A.      That's not my testimony, Mr. Abbott.**

**Q.      How is that wrong?**

**A.      It's wrong that the parties reached a formal agreement during mediation.  As I just stated, there were issues outstanding that still needed to be worked out.**

Tr. at 74-75 (testimony of Michael Delaney) (emphasis added).

**Q.      Mr. Dougherty, do you agree at the end of the mediation that Judge Ziegler went through the five key points of the agreement?**

**A.      Yes.**

**Q.      And did both parties agree at that time that they were agreeable to those terms?**

**A.      To the general concepts of the terms, yes.**

**Q.      Did anyone say, "I'm only agreeable to general concepts," or did they just say, "I agree"?**

**A.      No, I believe people did say, "I agree," and I believe it was also discussed that at that time a formal agreement would be placed in writing and that the parties would review those and sign once that was finalized.**

Tr. at 66 (testimony of Patrick Dougherty) (emphasis added).

17.   The parties disagree about whether an agreement was reached at mediation especially with respect to two issues: (1) what constituted "market price," and (2) what constituted "merchantability."  In addition, the parties disagree about whether any oral settlement agreement reached was conditioned on a formal written agreement being negotiated and signed at a later date.

18.   Judge Ziegler testified that his understanding was that "market price" referred to the price that Douglas was receiving for selling the natural gas on the market:

> **Q.   Judge Ziegler, when you said as to the future price that Buckeye would get one-half of what Douglas was selling it for on the market, was it your understanding that it would truly be one-half of whatever Douglas was getting for the gas?**
>
> **A.   Yes, sir.**
>
> **Q.   So there was no discussion about indexes or anything like that?**
>
> **A.   None whatsoever. And one of the main contentions going into the mediation was Standard was insisting upon the continuation of the fixed price.  Buckeye was insisting on a variable going forward. And, therefore, by pegging it to the price that Douglas was able to sell the natural gas for in the future meant that the parties arrived at an agreement with which they could live.**
> **     That is, the price of natural gas in the future would vary and according with market conditions, and the parties would receive fifty percent of whatever that was.  In addition, it also meant that both parties bore the risk going forward as well as the downside going forward in terms of market price.**

Tr. at 28-29 (emphasis added).

19.   Melody Pritchard, President and CEO of Buckeye, during her testimony at the hearing, assented to counsel's suggestion that the parties agreed that the price would be "in general a fifty-fifty of market price."  Tr. at 45.  Melody Pritchard testified, however, that the

parties never discussed explicitly what would constitute "market price."  Id.  Melody Pritchard testified that at the time of the mediation she understood "market price" to mean "the Dominion prevailing price."  Tr. at 46.

20.     Counsel present at the mediation for Standard Steel and Douglas, Traci Rea, testified that she did not recall a specific discussion at the mediation about the definition of "market price," but that it was her understanding that it meant the price that Douglas was receiving for selling the natural gas on the market and that all parties understood that. T. Rea Dep. at 29-31.  Traci Rea testified that Buckeye's previous settlement proposal had tied "market price" to what Douglas received when it re-sold the gas.  T. Rea Dep. at 19-20, 31, 37-38.

21.     Buckeye's previous settlement proposal defined "market price" as follows: "The definition of Market Price being the price Douglas negotiates for Buckeye produced gas if Douglas sells outside the Standard Steel system."  Plaintiffs' Ex. 6 at 2.  Buckeye's previous settlement proposal also discussed an index-based price if Buckeye gas stayed within the Standard Steel system and a minimum price. Id.

22.     Counsel present at the mediation for Buckeye, Michael Delaney and Patrick Dougherty, did not recall any discussion at the mediation about the definition of "market price." Tr. at 61-62 (testimony of Patrick Dougherty), 70 (testimony of Michael Delaney).

23.     Judge Ziegler testified that there was an agreement between the parties regarding what constituted "merchantability":

**Q.     Was there any agreement as to merchantability?**

**A.      Yes, sir; there was.  Ms. Pritchard specifically stated in Phase Three of the mediation when we were all together would Standard and Douglas**

> **please define merchantability. They did, and she said, "Very good, I understand.  I agree."**

Tr. at 28  (emphasis added).

> **A.      . . . . And the final issue was merchantable quality.  I said to Standard, "Do you agree that the oil – that the natural gas must be of merchantable quality?"**
> **"Yes, sir."**
> **And I turned to Miss Pritchard and I said, "Do you agree?"**
> **And she said, "I have one question.  Will they please define merchantable quality for me," which they did.  And she said, "Yes, I agree."**
> **And those all are the issues that were resolved.  My notes were made contemporaneously with Phase Three, and all parties manifested an assent to all terms and conditions.**

Tr. at 31 (emphasis added).

24.    Melody Pritchard testified that there was a discussion of what would constitute "merchantability" during the final phase of mediation while everyone was present.  Tr. at 46-47. She testified, however, that she was not comfortable with the discussion of the term, there was a discussion that the engineers and attorneys would figure it out when they drafted the written agreement, and she assented to counsel's suggestion that it was her understanding that the "parameters of merchantability would be worked out by the engineers and lawyers as part of the final drafting of the agreement."  Tr. at 46-48.

25.    Counsel present at the mediation for Standard Steel and Douglas, Traci Rea, testified that, regarding "merchantability," the parties agreed that gas would be merchantable in accordance with the Peoples Gas standard of merchantability and that any question as to the Peoples Gas standard was clarified and consented to by Melody Pritchard at the mediation. T. Rea Dep. at 41-43.

12

26.    Counsel present at the mediation for Buckeye, Michael Delaney and Patrick Dougherty, testified that the parties agreed that the gas had to be "merchantable," but the exact details of what that meant would be worked out later.  Tr. at 62-64 (testimony of Patrick Dougherty), 70-71 (testimony of M. Delaney).

27.    The court credits the testimony of Judge Ziegler as well as admissions from Buckeye's representatives and finds that the parties entered into an agreement during the mediation on January 17, 2005 with respect to the following five key terms:

> 1. Standard Steel will pay Buckeye four quarterly installments of $25,000 each ($100,000 total) over the course of one year to settle Buckeye's claims for past gas sales.

> 2. Douglas will pay Buckeye 50% of the price that Douglas receives when it re-sells the gas for gas sales occurring after January 17, 2005.

> 3. In addition, Douglas will pay Buckeye a surcharge of ten cents per MCF for gas sales occurring after January 17, 2005.

> 4. Douglas will take up to 100,000 MCF of gas annually for gas sales occurring after January 17, 2005.

> 5. The gas sold by Buckeye must be merchantable as determined by the standard of Peoples Gas.

28.    The parties agreed to formalize the oral settlement agreement in writing.  Tr. at 31-32 (testimony of Judge Ziegler), 50 (testimony of Melody Pritchard), 65 (testimony of Patrick Dougherty), 71 (testimony of Michael Delaney).

29.    Judge Ziegler testified that it was his understanding that the oral settlement agreement reached at the mediation was not conditioned on a formal written agreement to be entered into later.  Tr. at 32, 34.

30.     Judge Ziegler testified that, in his experience, parties to a mediation sometimes require a written agreement to be prepared and signed during mediation, but that no request was made, nor written agreement prepared, during the mediation at issue here.  Tr. at 33-34.

31.     Judge Ziegler testified that, in his experience, it is common for parties to reach an oral agreement during a mediation session.  Tr. at 33.

32.     Counsel present at the mediation for Standard Steel and Douglas, Traci Rea, testified that it was her understanding that, although all of the parties present at the mediation knew there would be a formal written document drafted reflecting the terms of the oral settlement agreement, the oral settlement agreement was not conditioned on a formal written agreement to be entered into later.  She further testified that it was her understanding that everyone present knew that the oral settlement agreement reached at the mediation was a deal that would be enforceable.  T. Rea Dep. at 38-39.

32.     Melody Pritchard, President and CEO of Buckeye and client representative of Buckeye present at the mediation, and counsel for Buckeye present at the litigation, Michael Delaney and Patrick Dougherty, all testified at various times during the evidentiary hearing that they understood that the oral settlement agreement reached at the mediation was conditioned on a formal written agreement to be entered into later.  Tr. at 50 (testimony of Melody Pritchard), 65 (testimony of Patrick Dougherty), 71 (testimony of Michael Delaney).

33.     The court credits the testimony of Judge Ziegler and finds that though the parties contemplated that the oral settlement agreement would be reduced to writing, the parties did not condition the agreement on the execution of a written document.

14

## II. CONCLUSIONS OF LAW

**A. The parties entered into an enforceable oral settlement agreement at the mediation.**

1.     Oral settlement agreements are enforceable.  The United States Court of Appeals for the Third Circuit has made clear that "[a]n agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing."  Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970) (citing Good v. Pennsylvania R.R. Co., 384 F.2d 989 (3d Cir. 1967); Kelly v. Greer, 365 F.2d 669 (3d Cir. 1966); Main Line Theatres, Inc. v. Paramount, 298 F.2d 801 (3d Cir. 1962)). "Settlement agreements are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts."  D.R. by M.R. v. East Brunswick Bd. of Educ., 109 F.3d 896, 901 (3d Cir. 1997).

2.     Settlement agreements reached through mediation are as binding as those reached during litigation.  Id.  ("We agree that reaching a settlement agreement during mediation, rather than during litigation, does not lessen the binding nature of the agreement on the parties.") (agreeing with D.R. by M.R. v. East Brunswick Bd. of Educ., 838 F.Supp. 184, 190 (D. N.J.1993) ("The fact that this Agreement was reached during mediation does not in and of itself diminish the effect of the Agreement, or make it any less of a binding contract. To so hold would create a hierarchy of settlement agreements where some are deemed binding while others are not determinable merely by whether they were reached during mediation or during litigation. Such a rule would create confusion and indefiniteness as to the effect of a settlement agreement. Accordingly, it may have a chilling effect on the use of such agreements as parties would never know whether the matter was finally resolved.")).

3.     Settlement agreements are interpreted as binding contracts.  Orta v. Con-Way Transportation, 2002 31262063 (E.D. Pa. 2002) (citing Columbia Gas Systems, Inc. v. Enterprise Energy Corp., 50 F.3d 233, 2328 (3d Cir. 1995)).  Thus, settlement agreements are construed according to traditional principles of contract law.  Id.  See also Coltec Industries v. Hobgood, 280 F.3d 262, 269 (3d Cir. 2002) (citing In Re Cendant Corp. Prides Litig., 233 F.3d 188, 193 (3d Cir. 2000) ("[B]asic contract principles ... apply to settlement agreements ....)).

4.     Pennsylvania law recognizes and enforces oral settlement agreements.  See McDonnell v. Ford Motor Co., 643 A.2d 1102, 1105-06 (Pa. Super.1994) ("It is well-established that '[t]he enforceability of settlement agreements is determined according to principles of contract law.'") (quoting Century Inn, Inc. v. Century Inn Realty, Inc., 516 A.2d 765, 767 (Pa. Super. Ct. 1986)).

5.     Pennsylvania law will enforce an oral settlement agreement if all of the material terms of the bargain are agreed upon, even if the parties intend to reduce the agreement to writing at a later date.  Id.  (citing Johnston v. Johnston, 499 A.2d 1074, 1076 (Pa. Super. Ct. 1985) ("If parties agree upon essential terms and intend them to be binding, 'a contract is formed even though they intend to adopt a formal document with additional terms at a later date.'") (citations omitted).

6.     The intent of the parties is a question of fact which must be determined by the factfinder.  Johnston, 499 A.2d at 1076 (citations omitted).  If the existence and binding effect of the settlement agreement is contested by the parties, an evidentiary hearing exploring these matters is the appropriate procedure.  McDonnell v. Ford Motor Co., 643 A.2d at 1105-06 (citing Limmer v. Country Belle Cooperative Farmers Corp., 286 A.2d 669, 670 (Pa. Super. Ct. 1971)).

16

7.    This court held an evidentiary hearing on July 27, 2005.  The court heard evidence and argument concerning whether the parties entered into an oral settlement agreement during mediation on January 17, 2005, and what agreement, if any, was reached.

8.    The court finds that the parties entered into a legally enforceable oral settlement agreement on January 17, 2005 with respect to five key issues:  the amount that Standard would pay Buckeye for gas it had received in the past, the amount that Douglas would pay Buckeye for gas it would receive in the future, the surcharge that Douglas would pay Buckeye for gas it would receive in the future, the amount of gas that Douglas would take from Buckeye in the future, and the standard of merchantability for the gas if one were applied.  In reaching this conclusion, the court credits in particular the testimony of Judge Ziegler, the neutral mediator presiding over the mediation that day.  The court also notes that defendant and counsel representing defendant at the mediation, by their own admission at the evidentiary hearing before this court, testified that agreement was reached regarding the five key issues negotiated at the settlement.  Further, defendant's party representative at the mediation, its President and CEO, manifested assent during the final phase of the mediation by answering "I agree" to each of these five key issues negotiated during settlement.

9.    The court finds that the five key issues negotiated during the settlement constitute the material terms of the settlement.  As noted above, Pennsylvania law will enforce an oral settlement agreement if all of the material terms of the bargain are agreed upon, even if the parties later intend to reduce the agreement to writing at a later date. McDonnell v. Ford Motor Co., 643 A.2d 1102, 1105-06 (Pa. Super.1994).  See also Johnston v. Johnston, 499 A.2d 1074, 1076 (Pa. Super. Ct. 1985) ("[I]f parties agree upon essential terms and intend them to be

17

binding, 'a contract is formed even though they intend to adopt a formal document with additional terms at a later date.'") (citing Courier Times, Inc v.United Feature Syndicate, Inc., 445 A.2d 1288, 1295 (1982); accord, Field v. Golden Triangle Broadcasting, Inc., 305 A.2d 689 (Pa. 1973), cert. denied, 414 U.S. 1158, 94 (1974); Bredt v. Bredt, 326 A.2d 446 (Pa. Super. Ct. 1974); RESTATEMENT OF CONTRACTS (SECOND) § 27 (1979)).  In Field, the court explained, "the fact that additional provisions would enhance the position of both parties is not controlling. What is necessary is that the parties agree to all the essential terms and intend the [agreement] to be binding upon them." 305 A.2d at 694.  See also Jasmine Exports v. New View Gifts,

2000 WL 1286399, at *3-4 (E.D. Pa. 2000).

10.   Here, there may well be gaps in the oral agreement reached by the parties. Nonetheless, so long as there was agreement as to essential terms, the oral agreement is enforceable.  See id.  Here the negotiation during mediation focused throughout every phase on the five key issues outlined by Judge Ziegler, the five key issues were agreed upon by every party, and the mediation was deemed concluded after each party specifically assented to terms necessary to resolve the five key issues.  The record supports the court's determination that the terms resolving the five key issues constitute the essential terms of the agreement.

11.   The court will enforce the agreement that was reached regarding the terms resolving the five key issues found to be the essential terms of the agreement.  The court, however, will not fill in gaps or interpret ambiguities, nor go beyond that which the evidence demonstrated that each party assented to, in enforcing the agreement.  See Olson v. North American Indust. Supply, 658 A.2d 358, 362 (Pa. Super. Ct. 1995).

12.    The court finds, based on the findings of fact herein, that the parties' understanding of "market price" as regards the settlement agreement was that "market price" meant that price that Douglas receives when it resells the gas.  The court does not take a position with respect to the dispute which arose later over "net price" and "gross price."  The court finds, based on the findings of fact herein, that the parties' understanding of "merchantable" as regards the settlement agreement was that "merchantable" would be determined by the standard of Peoples Gas.

13.    The parties contemplated that the oral settlement agreement would be reduced to writing.  The parties, however, did not condition the settlement agreement on the execution of a written document.  In such circumstances, the oral agreement is enforceable.  As explained in Bush v. Internat'l Business Machines, "[p]reliminary negotiations do not amount to a contract, ... "[i]f, however, all the material terms of a contract are agreed to and all that remains is to reduce this agreement to writing, an oral contract has been entered that is binding on the parties." Bush, 1989 WL 133644 (E.D. Pa.) *1 (citing RESTATEMENT (SECOND) OF CONTRACTS § 26 (1981); Kazanjian v. New England Petroleum Corp., 480 A.2d 1153 (1984)).  The court in Bush clarified further that:

> Likewise, an oral settlement agreement may be binding and enforceable absent a writing .... In addition, the Restatement Second of Contracts provides: "Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations."

Id. (internal citations omitted).

19

14.     The court finds that the parties agreed at the mediation to the following essential

terms comprising the settlement agreement:

> 1. Standard Steel will pay Buckeye four quarterly installments of $25,000 each
> ($100,000 total) over the course of one year to settle Buckeye's claims for past gas
> sales.

> 2. Douglas will pay Buckeye 50% of the price that Douglas receives when it re-
> sells the gas for gas sales occurring after January 17, 2005.

> 3. In addition, Douglas will pay Buckeye a surcharge of ten cents per MCF for gas
> sales occurring after January 17, 2005.

> 4. Douglas will take up to 100,000 MCF of gas annually for gas sales occurring
> after January 17, 2005.

> 5. The gas sold by Buckeye must be merchantable as determined by the standard
> of Peoples Gas.

**B. The no-oral modification clause in one of the contracts underlying the litigation has no
effect on the oral settlement agreement.**

15.     The oral settlement agreement reached by the parties on January 17, 2005 is not

affected by the no-oral modification clause in the Farmout Agreement, one of the three

agreements underlying the litigation.  Defendant submits that a no-oral modification clause, like

the one in the Farmout Agreement, must be enforced unless plaintiffs meet their burden of

showing that defendant specifically intended to waive its rights under the clause.  Defendant cites

Douglas v. Benson, 439 A.2d 779 (Pa. Super. Ct. 1982), in support.  Plaintiffs submit that, to the

contrary, the agreement at issue before the court is the oral settlement agreement reached during

mediation, not an agreement to amend one of the three underlying contracts containing the no-

oral modification clause, and that therefore reliance on Douglas is inapposite.  The court agrees

with plaintiffs' characterization.  Pending before the court is a motion to enforce settlement.  The

agreement at issue before the court is the oral settlement agreement reached by the parties at the mediation. The court in <u>Douglas</u> dealt not with the question of the effect of an oral settlement agreement to resolve a lawsuit, but with the question of the effect of negotiations to modify an agreement when parties were seeking to reach written agreement amending contract terms. <u>Id.</u> at 783-84.

16.     Even if the oral settlement agreement were affected by the no-oral modification clause in the Farmout Agreement, the parties' assent to the essential terms worked after submitting to and participating in mediation in an effort to reach a settlement to resolve the underlying dispute indicates a clear waiver of the no-oral modification clause. Pennsylvania law recognizes that no-oral modification provisions are waivable by the conduct of a party to the contract. <u>Somerset Community Hospital v. Mitchell</u>, 685 A.2d 141, 146 (Pa. Super. Ct. 1996) ("[A]n agreement that prohibits non-written modification may be modified by a subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing."). <u>See</u> <u>also</u> <u>Universal Builders v. Moon Motor Lodge</u>, 244 A.2d 10, 15-16 (Pa. 1968). The court finds that defendant's conduct of submitting to and participating in the mediation before Judge Ziegler for the sole purpose of settling the litigation, and defendant's failure to object to notification of the court or the court order regarding settlement, constitute defendant's clear waiver of the no-oral modification clause.

**C. The Statute of Frauds has no effect on the oral settlement agreement.**

17.     Though defendant argues that the natural gas agreements underlying the litigation are within the Statute of Frauds, and that therefore the proposed written settlement agreement is

within the Statute of Frauds, the oral settlement agreement before the court is not within the

Statute of Frauds.  The oral settlement agreement is not a modification to the underlying natural

gas sales agreements, but rather is a separate agreement to resolve the instant litigation.  Though

the effect of the oral settlement agreement may be to change the rights of the parties involved in

the dispute going forward, the settlement agreement does not attempt to enforce the parties'

obligations under the underlying contracts.  See Springton Pointe Assoc. v. Ledbetter, 50 Pa. D &

C.3d 503, 507-08 (1989).  Thus, defendant's Statute of Frauds defense is to no avail.  The court

notes, further, that the purpose of the Statute of Frauds is to prevent parties from escaping legal

obligations.  See id.  ("[T]he Statute of Frauds 'is not to prevent the performance or enforcement

of oral contracts that have in fact been made; it is not to create a loophole of escape for []

repudiators.'") (quoting 2 CORBIN ON CONTRACTS § 498).  When, as here, the court credits Judge

Ziegler's testimony, there is independent proof of the agreement between the parties.  Under

these circumstances, the normal concerns underlying the Statute of Frauds are not present.

    18.    Even if there were a Statute of Frauds defense available, the parties' decision to

submit to and participate in mediation in an effort to reach a settlement agreement to resolve the

underlying dispute indicates a clear waiver of any Statute of Frauds defense.  The Statute of

Frauds defense can be waived for contracts for the sale of goods valued at five hundred dollars or

more, which are covered by Article 2-2201 of the UCC, codified in Pennsylvania at 13 Pa.

C.S.A. § 2201.  See H.B. Alexander & Son v. Miracle Recreation Equip., 460 A.2d 343, 345 (Pa.

Super. Ct. 1983); Duffee v. Judson, 380 A.2d 843, 846-47 (Pa. Super. Ct. 1977).  See also Flight

Systems v. Electronic Data Systems Corp., 112 F.3d 124, 127-28 (3d Cir. 1997).  Assuming for

the sake of argument that the Statute of Frauds did apply, the court finds that defendant's conduct

of submitting to and participating in the mediation before Judge Ziegler for the sole purpose of

settling the litigation, and defendant's failure to object to notification of the court or the court

order regarding settlement, constitute defendant's clear waiver of any Statute of Frauds defense

which might otherwise apply.

## III.  OTHER MOTIONS

Defendant's motion to reopen the case (Doc. No. 23) is **DENIED AS MOOT**.

## IV. CONCLUSION

Plaintiffs' motion to enforce the settlement agreement (Doc. No. 24) is **GRANTED**.  The

parties are ordered to comply with the terms of the agreement made on January 17, 2005 as

follows:

1. Standard Steel will pay Buckeye four quarterly installments of $25,000 each
($100,000 total) over the course of one year to settle Buckeye's claims for past gas
sales.

2. Douglas will pay Buckeye 50% of the price that Douglas receives when it re-
sells the gas for gas sales occurring after January 17, 2005.

3. In addition, Douglas will pay Buckeye a surcharge of ten cents per MCF for gas
sales occurring after January 17, 2005.

4. Douglas will take up to 100,000 MCF of gas annually for gas sales occurring
after January 17, 2005.

5. The gas sold by Buckeye must be merchantable as determined by the standard
of Peoples Gas.

The parties are ordered to execute written documents formalizing this agreement and amending the underlying contracts as necessary.

## V. ORDER

**AND NOW**, this 29th day of September, 2005, in accordance with this court's findings of fact and conclusions of law, the motion to enforce settlement filed by plaintiffs is **GRANTED**. It is hereby ordered, adjudged, and decreed that the oral settlement agreement entered into by the parties at the mediation on January 17, 2005 is enforceable and the parties shall comply with the terms of the agreement consistent with this opinion.

The clerk shall mark this case closed.

By the court:


<u>/s/ Joy Flowers Conti</u>

Joy Flowers Conti
United States District Judge

cc:     Kevin C. Abbott
        Traci Sands Rea
        Reed Smith
        435 Sixth Avenue
        Pittsburgh, PA 15219-1886

        Michael S. Delaney
        Patrick Dougherty
        Philadelphia Street
        Indiana, PA 15701

        Thomas E. Birsic
        Thomas C. Ryan
        Kirkpatrick & Lockhart

Nicholson Graham
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA 15222-2312